AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED
Oct 30, 2024
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

SEALED

United States of America
v.

FRANCISCO CORNEJO-QUEZADA,
SHAWN ERIC MORALES SR., AND
RENEE MICHELLE HERMANN

*Defendants*

Case No. 2:24-mj-0132 CSK

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 10, 2023 – present in the county of Sacramento in the Eastern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) | Conspiracy to distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine |

This criminal complaint is based on these facts:

See attached Affidavit of DEA Special Agent James C. George

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

DEA Special Agent James C. George
*Printed name and title*

Sworn to me and signed via telephone.

Date: October 30, 2024

Chi Soo Kim
*Judge's signature*

City and state: Sacramento, CA

Chi Soo Kim, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLANT, ARREST WARRANTS, AND SEARCH WARRANTS**

I, Drug Enforcement Administration Special Agent James C. George, being duly sworn, hereby state:

1. This Affidavit is submitted in support of arrest warrants and a Criminal Complaint charging **Francisco CORNEJO-QUEZADA, Shawn Eric MORALES Sr.,** and **Renee Michelle HERMANN** with conspiracy to distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a). As set forth in further detail below, there is probable cause to believe **CORNEJO-QUEZADA, MORALES,** and **HERMANN** engaged in the conspiracy beginning at a date unknown but no later than on or about March 10, 2023 to present.

2. This Affidavit is also submitted in support of Search Warrants for the following locations, including people, vehicles, and telephones, which are more fully described in Attachments A-1 and A-2:

   a. The property located at 997 Hood Franklin Rd, Hood, CA ("**TARGET LOCATION**"), including four vehicles associated with **MORALES** and/or **HERMANN** as more fully described in Attachment A-1 and the following individuals:

      i. The person of **Shawn Eric MORALES Sr.**, DOB XX/XX/1973,;[1]

      ii. The person of **Renee Michelle HERMANN**, DOB XX/XX/1970;

   b. The following three cellular telephones, as described in Attachment A-2:

      i. The cellular telephone assigned call number 916-599-4787 (**TARGET CELL PHONE 1**);

      ii. The cellular telephone assigned call number 916-856-4460 (**TARGET CELL PHONE 2**).

      iii. The cellular telephone assigned call number 916-370-0953 (**TARGET CELL PHONE 3**).

[1] I partially redacted this and all other dates of birth from this Affidavit in an effort to protect the personally identifying information of the persons identified herein, should this Affidavit later be unsealed or otherwise made public. I retained a copy of the full dates of birth in my case file.

3. There is also probable cause to believe that **CORNEJO-QUEZADA, MORALES,** and **HERMANN** distributed over 500 grams of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), through a series of controlled purchases. Thus, this Affidavit requests authority to search the locations described in Attachments A-1 and A-2 in order to locate and seize the items described in Attachment B-1 and B-2 as evidence and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846.

4. I am a Special Agent of the Drug Enforcement Administration (DEA), and have been so employed since 2019. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516. Upon entering on duty as a DEA Special Agent, I was trained at the DEA Academy in Quantico, VA which included instruction on Sections 841(a)(1) and 846 of the Controlled Substances Act. I have participated in criminal investigations and the execution of search warrants targeting individuals and organizations involved in the trafficking of controlled substances. Prior to my employment with DEA, I served for over a decade as a federal law enforcement officer under the Department of Homeland Security with both the United States Border Patrol and Immigration and Customs Enforcement.

5. The facts in this affidavit are based on my direct involvement in this ongoing investigation, as well as information relayed to me by Homeland Security Investigations (HSI) Special Agent Nelson Torres and other law enforcement officers assisting with this investigation. As such, this Affidavit includes, but is not limited to, information which has been gathered through a variety of investigative techniques, to include my conversations with SA Torres, and conversations with other trained and experienced drug investigators, as well as my own research into historical reports and affidavits related to this investigation. This Affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaints, arrest warrants, and search warrants, and does not set forth all knowledge and facts about this ongoing investigation.

6. The recorded communications referenced in this affidavit are based on my review of historical reports and affidavits authored by SA Torres, as well as my discussions with SA Torres and personal review of certain audio recordings thereafter. For purposes of this affidavit, my transcriptions of portions of calls and recordings are summary translations in order to capture what I believe to be the context of the call, rather than all-inclusive verbatim transcripts.

## PROBABLE CAUSE

***Background of Investigation and Confidential Sources***

7. In February 2023, HSI Sacramento began investigating a suspected trafficker of illicit drugs in Northern California who was later identified as Francisco **CORNEJO-QUEZADA**. Since this investigation began, **CORNEJO-QUEZADA** has communicated with two confidential sources ("CS1" and "CS2") and arranged and/or coordinated multiple deliveries of controlled substances to CS1 and/or CS2. While **CORNEJO-QUEZADA** is believed to reside in the Northern District of California, the drug transactions he arranged, which are summarized below, occurred within the Eastern District of California, and **CORNEJO-QUEZADA** knew that he was distributing controlled substances to drug customers in the Eastern District of California.

8. Based on a review of historical law enforcement reports, as well as my discussions with investigators with personal knowledge of CS1's cooperation with law enforcement, I learned that CS1 has been cooperating with law enforcement since his/her drug trafficking related arrest in 2020 in exchange for possible leniency in charging and/or sentencing. In that particular instance, CS1 was pending California State charges for the drug trafficking related crime, charges which were eventually dismissed as a result of CS1's cooperation with law enforcement in a federal investigation. CS1 was also granted "Deferred Action" by the Department of Homeland Security (DHS), allowing him/her to remain in the United States and continued to cooperate with law enforcement, for example in the investigation described in this affidavit. As directly relayed to me by HSI SA Torres, the information provided by CS1 in this specific investigation has also been corroborated by additional law enforcement techniques including surveillance, database queries, and recorded interactions with the targets of this investigation. CS1's cooperation in the previous federal investigation led to numerous federal arrests for drug trafficking related crimes, as well as seizures of drugs.

9. CS2 has been cooperating with law enforcement since 2014 in exchange for monetary compensation and immigration benefits. CS2 has no prior criminal convictions. As relayed to me by HSI SA Torres, the information provided by CS2 in this specific investigation have also been corroborated by additional law enforcement techniques, including surveillance, database queries, and recorded communications. CS2's cooperation in previous federal investigations has led to multiple federal arrests for drug trafficking related crimes in multiple different investigations, as well as seizures of drugs, currency, and firearms. For these reasons, law enforcement believes CS1 and CS2 have provided reliable information in this investigation.

10. Related to the events described below, **CORNEJO-QUEZADA** is believed to have communicated with CS1 and CS2 on telephone number (831) 228-2312

while coordinating the delivery of drugs.[2] All phone calls between the confidential sources and **CORNEJO-QUEZADA**, **MORALES**, and/or **HERMANN** that are described in this Affidavit were recorded and preserved as evidence.

***Identification of Francisco CORNEJO-QUEZADA***

11. In April 2023, a then-unknown individual who was later identified as **CORNEJO-QUEZADA** used telephone number (831) 228-2312 to talk to CS1 about a sale of crystal methamphetamine, which led to a controlled purchase of approximately one pound of crystal methamphetamine further described below.[3] During these recorded conversations, **CORNEJO-QUEZADA** stated that he was not in the United States. While monitoring the Global Positioning System (GPS) data for this telephone phone number, SA Torres found that the data was not available, which led to SA Torres to believe that the phone and user of the phone, in this case believed to be unknown individual communicating with CS1, was not located in the United States. Additional GPS ping data analysis also showed historical alerts within the radius of the address 49 Blanca Lane Space 709, Watsonville, CA.

12. On or about May 6, 2023, while monitoring GPS data for (831) 228-2312, SA Torres received a GPS data alert showing that the phone was in Mexico and near to the Otay Mesa, California Customs and Border Protection (CBP) International Border. SA Torres conducted an analysis within the time frame of the GPS data alert on vehicles seeking entry into the United States from Mexico at the Otay Mesa Port of Entry (POE) to possible identify any vehicles that had a vehicle registration associated to an address near Watsonville, CA. The analysis led to the identification of a white Nissan Frontier bearing California license plate 98888Z2 that crossed into the U.S. within the time frame of analysis. A California Department of Motor Vehicles (DMV) query shows that the registered owner was Francisco **CORNEJO-QUEZADA** at 49 Blanca Lane Space 709,

---

[2] SA Torres previously applied for search warrants for geo-location data related to this phone number: (1) 2:23-sw-0250-DB (authorized on March 14, 2023); (2) 2:23-sw-0409 CKD (authorized on April 21, 2023); and (3) 2:23-sw-0496 DB (authorized on May 19, 2023).

[3] Phone number (831) 228-2312 was a prepaid phone registered to “Diego Garcia Lopez” at 1701 E Lake Ave, Watsonville, CA. Law enforcement researched the subscriber information and did not find a “Diego Garcia Lopez” associated with that address. SA Torres previously described this address to be an apartment complex with multiple units, and that subscriber information did not include an apartment number. Based on my independent review of this address, it appears to be a single family home possibly converted into two separate units, and commercial database records indicate there is a “Unit A,” which is not specified in the subscriber information. Based on my training and experience, I believe **CORNJEO-QUEZADA** used a fictitious name when obtaining this phone, which I know is a common method used by drug traffickers in order to avoid detection be law enforcement.

Watsonville, CA. Records of this crossing at the Otay Mesa POE reflect that **CORNEJO-QUEZADA** crossed in this vehicle and was accompanied by a minor.

13. SA Torres obtained photos of the white Nissan Frontier with CA plate 98888Z2 as it was crossing into the United States on May 6, 2023. SA Torres compared the physical appearance of the driver of that vehicle with a California DMV photograph for **CORNEJO-QUEZADA** and concluded that he was the driver of the vehicle.

14. Based on the foregoing and the May 10, 2023 controlled purchase surveillance described below, it is believed that Francisco **CORNEJO-QUEZADA** was the user of telephone number (831) 228-2312, which he used to arrange the delivery of drugs with CS1 and CS2 described below.

***Controlled Purchase of Methamphetamine on April 12, 2023***

15. On or about April 12, 2023, **CORNEJO-QUEZADA** arranged to deliver one pound of methamphetamine to CS1 in the Sacramento area. During a conversation leading up to the deal, on March 10, 2023, **CORNEJO-QUEZADA** and CS1 referred to crystal methamphetamine as "las muchachas" while discussing the sale of crystal methamphetamine. Based on SA Torres' training and experience in in drug investigations, he knows the term "las muchachas" is a common term used by drug traffickers as coded language for crystal methamphetamine. The English translation of this term is "the girls."

16. CS1 told **CORNEJO-QUEZADA** that prior to establishing regular transactions involving "las muchachas," CS1 would first need a sample to ensure its quality. **CORNEJO-QUEZADA** informed CS1 that the price would be $800 per pound. Later, **CORNEJO-QUEZADA** contacted CS1 to organize the sale of one pound of methamphetamine and increased the price to $1,050 per pound. CS1 told **CORNEJO-QUEZADA** that he/she would send a friend (CS2) to complete the transaction. As instructed by investigators, CS1 gave **CORNEJO-QUEZADA** a telephone number for CS2, who was to complete the transaction on behalf of CS1.

17. **CORNEJO-QUEZADA** later contacted CS2 to finalize the details of the transaction, to occur on April 12, 2023. **CORNEJO-QUEZADA** explained that a female would deliver the drugs to CS2. **CORNEJO-QUEZADA** specified to CS2 that the female would be driving a red car and would contact CS2 when she was getting close.

18. Later that same day, a female, who was later identified as Analexis LOPEZ, contacted CS2 and directed CS2 to her location. Investigators observed LOPEZ driving a red Honda Fit bearing California license plate 8BDJ558 meet with and

deliver approximately one pound of methamphetamine to CS2. During the transaction, CS2 paid LOPEZ $1,050 in exchange for the drugs.

19. Law enforcement took custody of the suspected methamphetamine from CS2 and submitted it to the DEA lab for further testing, which confirmed that the substance weighed approximately 442.4 grams net weight and was found to contain methamphetamine hydrochloride.

***Controlled Purchase of Methamphetamine on May 10, 2023***

20. On or about May 10, 2023, **CORNEJO-QUEZADA** spoke with CS1 and coordinated the delivery of methamphetamine and a sample of heroin to CS2. **CORNEJO-QUEZADA** informed CS1 that he (**CORNEJO-QUEZADA**) could sell a total of 12 pounds of methamphetamine to CS1 because it was packaged by 6-pound quantities. **CORNEJO-QUEZADA** and CS1 agreed to a total of 12 pounds for the price of $850 per pound. Additionally, **CORNEJO-QUEZADA** asked CS1 to pay a fee to the girl, believed to be LOPEZ, for the transport of drugs.

21. Initially, **CORNEJO-QUEZADA** and CS1 agreed upon a transaction date of April 27, 2023. On April 26, **CORNEJO-QUEZADA** told CS1 that he would have the girl, believed to be LOPEZ, arrive between 9:00 am and 10:00 am the following day. **CORNEJO-QUEZADA** told CS1 that the girl would be leaving early in the morning, around 6:00 am, to deliver the drugs. The following day, the transaction ultimately did not take place. **CORNEJO-QUEZADA** apologized several times to CS1 and said he would re-arrange the deal through LOPEZ at a later date, and that he would include a sample of heroin.

22. On May 9, 2023, **CORNEJO-QUEZADA** told CS1 that he would sell 12 pounds of methamphetamine to CS1 on May 10. **CORNEJO-QUEZADA** told CS1 that the same female from last time would meet with CS1's friend (CS2) to deliver the methamphetamine. **CORNEJO-QUEZADA** asked for CS2's number so that LOPEZ could call CS2 to further coordinate the deal.

23. On May 10, 2024, prior to the transaction, surveilling law enforcement agents followed both LOPEZ and **CORNEJO-QUEZADA** from their respective residences to an arrival at a Taco Bell parking lot located at 14 Green Valley Road, Freedom, CA whereupon LOPEZ approached **CORNEJO-QUEZADA's** vehicle for a brief meeting. LOPEZ then drove away in her vehicle and surveilling law enforcement agents followed her to a Chevron located in Kettleman City, CA. While at this gas station, agents observed LOPEZ meet briefly with a male subject who arrived in a separate vehicle. He then removed a light blue laundry basket or hamper from his vehicle and placed it in the rear cargo area of LOPEZ's red Honda Fit, followed by a hand-to-hand transfer of an unknown object, between LOPEZ and the male subject. Surveilling law

enforcement agents then followed LOPEZ away from the gas station as she traveled northbound on Interstate 5 toward Stockton, CA.

24. Prior to LOPEZ's arrival at the meeting location, **CORNEJO-QUEZADA** contacted CS2 and said that LOPEZ was about an hour away from a previously agreed-upon meeting location in Stockton, CA. Approximately an hour later, LOPEZ arrived at the meeting location and contacted CS2 to inform CS2 that she would be waiting. While at the meeting location, surveilling law enforcement agents, who had maintained constant surveillance of LOPEZ since she left the Chevron in Kettleman City with the laundry basket, saw LOPEZ retrieve a big blue bag from the cargo area of her vehicle and bring it to the rear passenger seat of her vehicle. This bag was retrieved from the same cargo area of her vehicle where the male subject had put the blue laundry basket.

25. Upon arrival at the meeting location, CS2 parked next to LOPEZ. LOPEZ provided CS2 with approximately 12 pounds of methamphetamine as well as a paper bag which contained a small quantity of heroin, all in exchange for $11,000 which CS2 handed to LOPEZ.

26. In the days after this controlled purchase, CS1 received a call from (831) 587-3718. It was a male voice which CS1 recognized to be **CORNEJO-QUEZADA**, who informed CS1 this was his new number and to call when he/she (CS1) was ready for more "muchachonas." Based on SA Torres' training and experience in drug investigations, and considering the context, SA Torres believes "muchachones" was a term referencing methamphetamine. **CORNEJO-QUEZADA** also inquired about the sample of heroin and asked if it was good.

27. The suspected methamphetamine and heroin seized on May 10, 2023, were submitted to the DEA Laboratory for the analysis and safekeeping. The results are as follows: a package related to the events of May 10, 2023 as described above, weighing approximately 5201 grams net weight, was found to contain methamphetamine hydrochloride; and a package related to the events of May 10, 2023 as described above, weighing approximately 1.953 grams net weight, was found to contain heroin.

***Controlled Purchase of Methamphetamine from CORNEJO-QUEZADA and MORALES on February 13, 2024***

28. In October 2023, **CORNEJO-QUEZADA** began communicating with CS1 on telephone number (831) 587-3036 and engaged in further discussion about a possible drug transaction. **CORNEJO-QUEZADA** told CS1 to let him know when CS1 needed more methamphetamine and indicated that he would match the price or offer a better deal. During this investigation, **CORNEJO-QUEZADA** mentioned that he had someone in the Sacramento area that could facilitate the sale of crystal methamphetamine. CS1 previously attempted to be put in

communication with the unknown local drug source in the Sacramento area, however, **CORNEJO-QUEZADA** was reluctant to share this information.

29. As communication continued, **CORNEJO-QUEZADA** told CS1 that he could facilitate the sale of 10 pounds of methamphetamine from his friend who lives in the area (in context and based on my communications with SA Torres, I believe **CORNEJO-QUEZADA** meant the Sacramento area). **CORNEJO-QUEZADA** said that he would call his friend to check on the prices. **CORNEJO-QUEZADA** ultimately agreed to sell CS1 approximately ten pounds of methamphetamine, which would be delivered to CS2 by an individual later identified as **MORALES** for $12,000 plus a $500 referral fee for **CORNEJO-QUEZADA**, and agreed to conduct the deal on February 13, 2024.

30. On February 13, 2024, **CORNEJO-QUEZADA** and CS1 were in communication related to the anticipated drug transaction. **CORNEJO-QUEZADA** asked if CS1's partner was ready, referring to CS2. **CORNEJO-QUEZADA** then informed CS1 that his guy would be ready around 12:00 p.m. or 12:30 p.m., and to have CS2 be in the area at that time. **CORNEJO-QUEZADA** added that he would text CS1 the address to provide to CS2, and that the pickup location would be at a corner house enclosed with a black gate. After the call ended, CS1 received the address of Fifth Street, Hood, CA.

31. Law enforcement entered this address into Google Maps, which showed a house located on the corner of Fifth Street and Hood Franklin Rd. The house appeared to be enclosed by both fencing and a gate. According to Google Maps, the address is 997 Hood Franklin Rd, Hood, CA. Hood, CA is a small rural community to the west of the Elk Grove, CA city limits. **CORNJEO-QUEZADA** had previously indicated to CS1 that his methamphetamine source was in Elk Grove, CA.

32. After **CORNEJO-QUEZADA** provided this location for the transaction to take place, CS2 contacted **CORNEJO-QUEZADA** to express that CS2 was not comfortable going to the address. **CORNEJO-QUEZADA** relayed to CS2 that the transaction had to be at the house because his "cousin" could not leave his kids alone.

33. On the same day, CS2 met with law enforcement agents before the pre-arranged controlled purchase. Agents searched CS2 and CS2's vehicle for contraband with negative results, then provided CS2 with U.S. currency for the controlled purchase and equipped CS2 with an audio recording device. Agents then escorted CS2 to the meeting location, ultimately arriving at 997 Hood Franklin Rd, Hood, CA (the "**TARGET LOCATION**") whereupon CS2 met with an individual outside of the property. Due to operational considerations, law enforcement did not conduct static surveillance at the **TARGET LOCATION** during this operation. The individual with whom CS2 met at the **TARGET LOCATION**, who was later identified as **MORALES**, provided CS2 with a cardboard box

containing approximately 10 pounds of crystal methamphetamine in exchange for $12,000 provided by CS2. During this controlled purchase, **CORNEJO-QUEZADA** also provided instructions for CS1 to send him the $500 referral fee via Zelle.

34. During subsequent debriefing with CS2, CS2 gave agents the suspected methamphetamine from the controlled purchase. CS2 said that the individual later identified as **MORALES** retrieved a box from inside of the storage unit on the property. **MORALES** then met with CS2 and handed CS2 the box, which was found to contain suspected methamphetamine. After the transaction, **MORALES** returned to the house with the money. The property was identified as 997 Hood Franklin Rd, Hood (**TARGET LOCATION**).

35. Commercial database records associated to the **TARGET LOCATION** show that it is associated with Shawn E **MORALES**, DOB XX/XX/1973. California Department of Motor Vehicles (DMV) records list a Shawn Eric **MORALES** Sr. with the same date of birth as listed in the commercial records, and an address of P.O. Box 234, Hood, CA 95639. Records held with the Sacramento Municipal Utility District (SMUD) on the **TARGET LOCATION** list customer name Shawn E **MORALES**, telephone numbers (916) 599-4787 and (916) 201-2892, and a service start date of February 4, 2022. SA Torres also relayed to me that he provided a California DMV photo of **MORALES** to CS2 who confirmed this to be the same individual who delivered the drugs to CS2. Furthermore, an administrative subpoena was later submitted to T-Mobile for telephone number (916) 599-4787 (**TARGET CELL PHONE 1**). Per subpoena results, initially received in March of 2024 and as recent as October 2024, **TARGET CELL PHONE 1** is subscribed to Shawn **MORALES**, P.O. Box 234, Hood, CA; service began on December 9, 2023.

36. HSI submitted the suspected methamphetamine obtained during this controlled purchase operation to the DEA Laboratory for analysis. DEA lab results show that the substance weighed approximately 4,432 grams (net) and contained methamphetamine hydrochloride.

***Controlled Purchase of Methamphetamine from CORNEJO-QUEZADA and HERMANN on March 14, 2024***

37. In March 2024, **CORNEJO-QUEZADA** agreed to sell CS1 another 10 pounds of methamphetamine, which would be delivered to CS2 for the price of $1,100 per pound, plus a $500 referral fee for **CORNEJO-QUEZADA**. **CORNEJO-QUEZADA** and CS1 agreed to conduct the deal on March 14, 2024.

38. On March 14, 2024, CS2 met with agents before the pre-arranged controlled purchase. Agents searched CS2 and CS2's vehicle for any contraband with negative results, then provided CS2 with cash for the controlled purchase. Law enforcement escorted CS2 to the **TARGET LOCATION**, whereupon CS2 met

with a woman later identified as Renee Michele **HERMANN**. Before this meeting between CS2 and **HERMANN**, agents saw that a Silver Toyota Matrix bearing California license plate YASHI46 was parked in front of the **TARGET LOCATION**. Per CA DMV records, the Toyota Matrix is registered to Royce Lavergne MCCLELLAN or Renee Michele **HERMANN** at address 1901 Matson Drive, Sacramento, CA.

39. **HERMANN** provided approximately 10 pounds of suspected methamphetamine to CS2 in exchange for $10,500.00 which was in a lightly colored gift bag that CS2 handed to **HERMANN**. During the transaction, CS2 asked **HERMANN** if CS2 could buy an extra five pounds of methamphetamine. Initially, **HERMANN** said she did not have another five pounds. CS2 gave **HERMANN** a phone number so that **HERMANN** could text CS2 if she was able to deliver the extra five pounds later. Law enforcement escorted CS2 away from the **TARGET LOCATION**. Agents retrieved the backpack containing the suspected ten pounds of methamphetamine CS2 bought from **HERMANN**.

40. Approximately nine minutes later, **HERMANN** called CS2 from (510) 730-4611 during which **HERMANN** said that she had another five pounds of methamphetamine. Moments later, during continued surveillance at the **TARGET LOCATION,** law enforcement observed **HERMANN** on the northern portion of the property and appeared to be attempting to open a Conex-style shipping container that was located on the property. She also appeared to be wearing a blue protective glove on her right hand and holding a grey plastic bag which looked to be empty based on its movement. While attempting to access the Conex, it looked like she was on the phone. After a brief moment, she successfully opened the Conex, entered it, and after a moment exited with the bag. The bag appeared to be heavy or contain something based on its movement. She then closed the Conex, appeared to secure it, and then entered the residence with the bag and the glove still on her right hand.

41. CS2 returned to the **TARGET LOCATION**, escorted by agents. CS2 again met with **HERMANN** who gave CS2 a grey plastic bag later found to contain approximately five pounds of suspected methamphetamine. CS2 paid **HERMANN** for the extra five pounds. **HERMANN** went back inside the house, and agents escorted CS2 away to a neutral location where agents obtained the additional suspected methamphetamine from CS2. SA Torres later provided a DMV issued photo of **HERMANN** to CS2, and CS2 confirmed **HERMANN** was the person who sold drugs to CS2 on March 14, 2024.

42. HSI submitted the suspected methamphetamine obtained during this controlled purchase operation to the DEA Laboratory for analysis, the results of which are as follows: packages weighing a total of approximately 6648.3 grams net weight were found to contain methamphetamine hydrochloride.

43. Law enforcement later queried a commercial database for Renee **HERMANN** and found an associated telephone number of (916) 856-4460 (**TARGET CELL PHONE 2**). Law enforcement submitted an administrative subpoena to T-Mobile for **TARGET CELL PHONE 2**. Per subpoena results, initially received in March of 2024, **TARGET CELL PHONE 2** is subscribed to Renee **HERMANN**, 1901 Matson Drive, Sacramento, CA; service began on March 12, 2020. More recently, in October of 2024, subpoena results on **TARGET CELL PHONE 2** still showed the subscriber to be Renee **HERMANN**, however, reflected a new address of 302 Curran Ave, Sacramento, CA 95833.

***Toll Analysis Related to TARGET CELL PHONES 1 and 2***

44. Law enforcement analyzed toll records associated with **TARGET CELL PHONE 2** and (510) 730-4611, which is the number **HERMANN** used to communicate directly with CS2 during the controlled purchase on March 14, 2024. During the controlled purchase, CS2 met with and interacted with **HERMANN** between approximately 4:15 pm and 4:25 pm. It was in this time frame that CS2 obtained the initial 10 pounds of suspected methamphetamine from **HERMANN**, and then asked about obtaining five additional pounds. Toll records show that between approximately 4:19 p.m. and 4:21 pm, while CS2 was interacting with **HERMANN**, **TARGET CELL PHONE 1** (**MORALES**) contacted **TARGET CELL PHONE 2** (**HERMANN**) three times. Based on surveillance of CS2 meeting with **HERMANN** and the duration of the calls according to toll records, it appears all three calls were unanswered.

45. Toll records show that at approximately 4:31 pm, after CS2's meeting with **HERMANN** at the **TARGET LOCATION**, **TARGET CELL PHONE 1** contacted **TARGET CELL PHONE 2**, and the call lasted approximately one minute and forty-five seconds. The next call in the toll records shows (510) 730-4611 (**HERMANN**) contacted CS2 at approximately 4:33 p.m. CS2 did not answer this initial call, however, (510) 730-4611 called CS2 again at approximately 4:34 pm, and CS2 answered. Per SA Torres, this was the call in which **HERMANN** told CS2 that she had the extra five pounds.

46. At approximately 4:45 p.m., **TARGET CELL PHONE 2** called **TARGET CELL PHONE 1** and the call lasted approximately two minutes and nine seconds. Moments later, at approximately 4:50 p.m., law enforcement observed **HERMANN** at the Conex shipping container located on the property of the **TARGET LOCATION**. As described above, this is when **HERMANN** appeared to retrieve what was later determined to be the additional five pounds of suspected methamphetamine.

47. At approximately 4:56 pm, **TARGET CELL PHONE 1** contacted **TARGET CELL PHONE 2**, and the call lasted approximately thirty seconds.

48. At approximately 5:03 p.m., CS2 met with **HERMANN** at the **TARGET LOCATION** and received the additional five pounds of methamphetamine.

49. Based on my training and experience, and my conversations with SA Torres and other experienced investigators, I know that drug traffickers often use multiple phones while facilitating illicit drug transactions as a method to evade detection by law enforcement. In this case, **HERMANN** was utilizing (510) 730-4611 to communicate with CS2 to complete a drug transaction. During this general time frame, a phone number subscribed to her (**TARGET CELL PHONE 2**) was communicating with a phone number subscribed to **MORALES** (**TARGET CELL PHONE 1**), both of whom are identified in this investigation as distributors of methamphetamine. In my discussions with SA Torres on this matter, and based on the toll analysis described above, I believe that **HERMANN** and **MORALES** were utilizing **TARGET CELL PHONES 1 and 2** to coordinate the transaction between **HERMANN** and CS2 on March 14, 2024.

***Execution of GPS Phone Locator on TARGET CELL PHONE 1 and TARGET CELL PHONE 2 in May 2024***

50. On May 2, 2024, the Honorable Jeremy D. Peterson, United States Magistrate Judge, authorized a GPS phone location warrant for **TARGET CELL PHONE 1** and **TARGET CELL PHONE 2** and (510) 730-4611 (2:24-sw-0452 JDP).

51. On or about May 3, 2024, I began receiving geo-location data on the **TARGET CELL PHONES** by way of email alerts from T-Mobile. In summary, these alerts include the identifier or telephone number, the date, the time, and an approximate location in the form of GPS coordinates and an associated hyperlink to a mapping program. Additionally, the email will list a general radius which includes a measurement of uncertainty or margin of error, meaning the location may not be precise, rather a general vicinity of the location. This uncertainty or margin of error may vary in measurement.

52. During surveillance of the **TARGET LOCATION**, **MORALES** and **HERMANN** were positively identified and regularly observed at the **TARGET LOCATION**. On multiple occasions during the execution period of the search warrant for the GPS phone locators on the **TARGET CELL PHONES**, their presence was identified at the **TARGET LOCATION** and correlated with geo-location data on the **TARGET CELL PHONES**. Furthermore, observations of their movement toward and away from the vicinity of the **TARGET LOCATION** corresponded with the general vicinity of the geo-location data on the **TARGET CELL PHONES**.

53. Based on the foregoing, as well as my training and experience and ongoing conversations with SA Torres, I believe that **MORALES** and **HERMANN** are the users of **TARGET CELL PHONE 1** and **TARGET CELL PHONE 2**, respectively.

***August 2024 purchase of methamphetamine from MORALES at the TARGET LOCATION***

54. On August 15, 2024, law enforcement directed CS2 to attempt an impromptu controlled purchase from **MORALES** and/or **HERMANN** at the **TARGET LOCATION**. Leading up to August 15, 2024, CS2 had no contact with either **MORALES** or **HERMANN** since the general timeframe surrounding the March 14, 2024 controlled purchase.[4]

55. Agents established surveillance near and around the **TARGET LOCATION** and observed the following vehicles parked at the residence: (1) a Toyota Matrix with CA license plate YASHI46, registered to Royce Lavergne McClellan or Renee Michele **HERMANN** at 1901 Matson Drive, Sacramento, CA 95822, which was parked outside the perimeter fence on Hood Franklin Road; (2) a white Dodge Ram truck with CA license plate 48628Y2, registered to Shawn Eric **MORALES** Sr. at 997 Hood Franklin Rd, Hood, CA, which as parked in the driveway; and (3) a while crossover style SUV, believed to be a Subaru with CA license plate 9GXQ273, which is registered to Shawn Eric **MORALES** Sr. at P.O. Box 197, Hood, CA, which was parked inside the vehicle gate toward the front end of the driveway near the detached garage. An unidentified male adult ("UM1") was washing this white Subaru at the time.

56. CS2 met with law enforcement agents at a neutral meeting location, where agents searched CS2 for unauthorized contraband and found none. Agents equipped CS2 with an audio monitoring device. CS2 and surveilling law enforcement agents left the neutral meeting location and proceeded to the **TARGET LOCATION.**

57. Upon arrival, CS2 parked in front of the **TARGET LOCATION** outside of the perimeter fence, in an area visible from the front area of the residence, and briefly honked CS2's car horn. UM1 approached CS2. CS2 asked if anyone was home, and UM1 told CS2 he'll be back in a little bit." UM1 went into the house, and then returned to talk with CS2 again. UM1 told CS2 that no one was home, and they should be back within a couple of hours. Before CS2 drove away, CS2 gave UM1 his/her phone number. UM1 said "within an hour I'll call you back with either their phone number or they will call you."

58. At approximately 1:15 p.m., CS2 returned to a neutral location with supervising law enforcement officers. At approximately 1:36 p.m., surveilling law enforcement officers saw a silver hatchback-type vehicle arrive at the **TARGET LOCATION** and pull into the driveway and park. **MORALES** has a silver BMW with CA license plate 8VQW289 that is registered to him. It is noted that the registration information lists the address of 977 Hood Franklin Rd, rather than

[4] During the March 14 controlled purchase, **HERMANN** used telephone number 510-730-4611 to communicate with CS2. Based on correspondence from T-Mobile, the account associated to that telephone number was terminated on or about April 22, 2024.

997 Hood Franklin Rd (**TARGET LOCATION**). An internet map search of 977 Hood Franklin Rd did not reveal it to be an actual address. The addresses along Hood Franklin Rd appear to be as follows: 997, 987, 985, 975, 971, etc. Furthermore, this investigation identified the **TARGET LOCATION** to be **MORALES**' residence. Therefore, I believe this particular BMW to be directly associated to MORALES at the **TARGET LOCATION**. A male driver, who appeared to be **MORALES**, and female passenger, who appeared to be **HERMANN**, exited the silver BMW.

59. At approximately 1:45 p.m., CS2 received a phone call from **TARGET CELL PHONE 1,** the number previously identified in this investigation as belonging to **MORALES**, and CS2 recognized the voice as **MORALES**. **MORALES** asked CS2, "is this [CS2's moniker]," and CS2 said "yeah." **MORALES** said, "homeboy from Pancho," and said that "Pancho left his phone in the ocean." CS2 later relayed to agents that "Pancho" is a common nickname for "Francisco." Based on my training, experience, and experience in this investigation as well as my communications with CS2, I believe **MORALES** was acknowledging that he remembered CS2 as a customer who was referred to him by **CORNEJO-QUEZADA**, and furthermore indicated to CS2 that **CORNEJO-QUEZADA** discontinued use of a phone number. This is a common practice of drug traffickers in an attempt to conceal illicit communications and, in this particular investigation, **CORNEJO-QUEZADA** was known to use multiple telephone numbers. CS2 indicated to **MORALES** that he/she wanted to do business with **MORALES**. **MORALES** said he would call CS2 from a different number and told CS2 to answer the phone.

60. Shortly thereafter, CS2 received a phone call from (916) 370-0953 (**TARGET CELL PHONE 3**), and CS2 recognized the caller as **MORALES** from CS2's previous meeting with **MORALES**. **MORALES** confirmed that he had methamphetamine available at a price of $1,000 per "piece," and asked how much CS2 was looking to purchase. In context and based on my training and experience, I believe **MORALES** used the term "piece" as slang for a pound of methamphetamine in this instance.

61. A few minutes later, at approximately 1:55 p.m., CS2 called **MORALES** and asked to buy ten pounds. **MORALES** agreed and told CS2 he could be ready in 15-20 minutes.

62. Surveilling law enforcement officers continued to watch the **TARGET LOCATION** and did not see **MORALES** exit the house or leave the property between 1:55 p.m. when CS2 called **MORALES** to order the 10 pounds, and approximately 2:11 p.m., when **MORALES** called CS2 from **TARGET CELL PHONE 3** and told CS2, "I'm ready, just come on to the side of the house like last time," and said that he would "have the gate open"; **MORALES** also asked CS2 to call when CS2 was close.

63. Law enforcement provided CS2 with official funds and led CS2 back to the **TARGET RESIDENCE**. CS2 called **MORALES** at approximately 2:31 p.m. and said CS2 was close. **MORALES** told CS2 to "pull up on the side of the house I'll have the gate open." Immediately prior to CS2's arrival, agents saw **MORALES** walk out the back door of the house carrying a dark colored backpack. **MORALES** walked over to where CS2 was parking and put the backpack in the rear seat, and CS2 paid him for the ten pounds of methamphetamine.

64. CS2 returned to a neutral meeting location and met with law enforcement, where law enforcement found a maroon backpack in the rear passenger area of the car, contained approximately 10 pounds of suspected methamphetamine.

65. HSI later submitted the suspected methamphetamine to the DEA Laboratory for analysis, the results of which are as follows: packages weighing a total of approximately 4479.8 grams net weight were found to contain methamphetamine hydrochloride

66. Law enforcement submitted an administrative subpoena to T-Mobile for account information associated to **TARGET CELL PHONE 3**. Per the subpoena results, initially received in August of 2024 and as recent as October of 2024, **TARGET CELL PHONE 3** is subscribed to Jonh CHAMBERS (of that spelling) with an address of 7372 Gardner Ave, Sacramento, CA 95828.; service began on June 17, 2024. Based on my training and experience, and conversations with other trained and experienced investigators, I know that it is common for drug traffickers to utilize phones with fictitious account information in attempt to conceal their identities from law enforcement.

***Recorded Communication with MORALES on October 28, 2024***

67. On October 28, 2024, CS2 placed a phone call to **MORALES** on **TARGET CELL PHONE 3** which was unanswered. Later that same day, CS2 placed a phone call to **MORALES** on **TARGET CELL PHONE 1**. This call was answered, and CS2 immediately recognized the person who answered the call to be **MORALES**. Upon reviewing the recorded call, I also believe the person who answered the phone to be **MORALES** based on the similarity in voice as compared to previous recorded calls with **MORALES** described in this affidavit.

68. During this recorded call between **MORALES** and CS2 on **TARGET CELL PHONE 1**, which lasted approximately one minute and 23 seconds, CS2 indicated to **MORALES** that he/she was looking to arrange a transaction involving "bottles," which is coded language CS2 used to reference methamphetamine. CS2 inquired as to what the price was and if it was the same. **MORALES** responded by saying, "Ya," and said he (**MORALES**) would call back later on a different phone.

69. Later that same day, CS2 received an incoming call from **TARGET CELL PHONE 3**. This call went unanswered by CS2, who then placed a return call to **TARGET CELL PHONE 3** shortly thereafter. During this recorded call between CS2 and **MORALES**, which lasted approximately one minute, CS2 continued the inquiry as to the availability of methamphetamine referenced in the earlier call by stating to **MORALES**, "…maybe around 20, if you can…" (meaning 20 pounds of methamphetamine) to which **MORALES** responded, "Ya." CS2 then indicated there would be a follow-up call on Saturday when the paper was ready (meaning money or cash) and that CS2 would call **MORALES** on time. **MORALES** responded and said, "It's all good, just call me on Saturday and we'll take it from there."

***Training and Experience Regarding Drug Trafficking and Drug Traffickers***

70. As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers. It is also my experience that these traffickers and co-conspirators tend to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the traffickers and co-conspirators reside. It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.

71. From my training and experience, I know that individuals involved in drug trafficking frequently store their drugs, drug proceeds, weapons, and other contraband in rooms and areas of their residences that appear to belong to, are controlled by, and/or are accessible to other occupants, including for example, bedrooms including those belonging to other family members, or roommates, in an effort to conceal the evidence from law enforcement and to disguise their ownership and control of the contraband in the event that it is seized. This warrant therefore seeks permission to search the entire premises of the residence for which the warrant is sought, including any location where there is reasonable cause to believe the items listed in Attachment B may be found.

72. Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over

them. In my training and experience, I have found that traffickers keep records of those registrations and transactions in their residence.

73. I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business. It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

74. In my experience, traffickers commonly have in their possession, that is, on their person, at their residence, and in the areas under their control, firearms, including but not limited to, handguns, pistols, revolvers, rifles, shotguns, and other weapons. Such firearms are used by drug traffickers to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug traffickers because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers, and quantities of currency.

75. In my experience, traffickers commonly have in their possession, that is on their person, at their residences, in their vehicles, and in the areas under their control and which they have free and ready access to, drugs, including but not limited to, in this case, methamphetamine, which they intend to distribute. It is my experience that these drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

76. In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

77. In my experience, large scale drug traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and used in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

78. In my experience, drug traffickers often use vehicles to transport and distribute controlled substances to facilitate their trafficking activities. It has also been my experience that traffickers will also use vehicles as locations in which to store

controlled substances prior to distribution. During this investigation, I determined that there are multiple vehicles at the target location which are registered to and known to be operated by Shawn Eric **MORALES** SR, and also a vehicle registered to and known to be operated by Renee **HERMANN**. During prior investigations, I have observed that drug traffickers will often use vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

79. In addition, traffickers have shown attempts to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

80. In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

81. Individuals involved in the distribution of controlled substances, in this case methamphetamine, often make, or possess, pictures, videos, movies, or other such items which are or contain photographic or digital images in order to memorialize their trafficking activities, use, possession, or any other activities surrounding trafficking activities, and that such items often identify co-conspirators in these trafficking activities.

82. In my experience, when suspects use mobile telephones to communicate with cooperating individuals or undercover agents to set up the drug deals, records relating to these activities may be found stored in the cellular telephone(s).

83. I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones can also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave

messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones. Further, mobile telephones including Android and Apple iPhones often contain applications which drug traffickers often use in furtherance of drug trafficking. Specifically, in my training and experience, I know that drug traffickers often used encrypted methods of communication, including applications such as WhatsApp or Signal, and social media platforms such as Instagram and Facebook in order to communicate with their drug customers and co-conspirators.

84. As described above and in **Attachments A-1 and A-2**, this Affidavit seeks permission to search and seize things that are related to the distribution of controlled substances, as described above, in whatever form such things are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

85. It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators with whom I have spoken, that the items listed in **Attachment B-1 and B-2** are items most often associated with the distribution of controlled substances, including those controlled substances described in this affidavit, as well as the proceeds from such illegal operations.

86. The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation. This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

87. Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in **Attachment B-1**. Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting,

testing, distributing, and identifying controlled substances. Therefore, I am requesting authority to seize all the items listed in **Attachment B-1** to this Affidavit and incorporated here by reference. As to the cell phones described in **Attachment A-2**, which have all been used in furtherance of drug trafficking during this investigation, I am further requesting authority to seize the items descried in **Attachment B-2**.

## CONCLUSION AND AUTHORIZATION REQUESTS

88. I respectfully request this Court to authorize a Criminal Complaint charging **Francisco CORNEJO-QUEZADA, Shawn Eric MORALES Sr.,** and **Renee Michelle HERMANN** with conspiracy to distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a).

89. I further request this Court to issue arrest warrants for **Francisco CORNEJO-QUEZADA, Shawn Eric MORALES Sr.,** and **Renee Michelle HERMANN** for this violation of 21 U.S.C. §§ 846, 841(a).

90. There is probable cause to believe that the locations listed in **Attachment A-1** and **A-2** contain evidence of a crime, contraband, fruits of a crime, and other items illegally possessed, property designed for use, intended for use, or used in committing a crime, specifically related to **CORNEJO-QUEZADA, MORALES,** and **HERMANN,** and their ongoing effort to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846. Thus, I respectfully request that this Court authorize the requested search warrants to search the locations listed in **Attachments A-1 and A-2** for evidence described in **Attachments B-1 and B-2**.

91. Finally, I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into criminal activities by **CORNEJO-QUEZADA**, **MORALES**, and **HERMANN**, and other co-conspirators. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants over the internet, and disseminate them to other criminals as they deem appropriate, *i.e.*, post them publicly online. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness, as well as endanger the safety of agents serving the warrant requested. I also request that, notwithstanding the sealing order, the Court permit disclosure of this affidavit to counsel, if any, for **CORNEJO-QUEZADA**, **MORALES**, and **HERMANN**.

92. I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

/s/
_______________________________
James C. George, Special Agent
Drug Enforcement Administration

Sworn to and subscribed telephonically on the 30 day of October 2024

Chi Soo Kim
_______________________________
HON. CHI SOO KIM
UNITED STATES MAGISTRATE JUDGE

Approved as to form by:
/s/ *Emily G. Sauvageau*
Assistant U.S. Attorney Emily G. Sauvageau

# Attachment A-1

## *Location to be Searched*

A. The property located at 997 Hood Franklin Rd, Hood, CA 95639; Assessor's Parcel Number (APN) 132-0101-020-0000 ("**TARGET LOCATION**"). The property is located in a residential area and is recorded as residential single family on approximately half an acre. The property appears to have a single-story main dwelling, white in color, with the numbers "997" affixed near the front door which faces south toward Hood Franklin Rd. There is also a detached garage type building to the west of the dwelling, and a Conex style shipping container located to the north of the dwelling. The property is enclosed by fencing structures and borders Hood Franklin Rd to the south and 5th Street to the east.









B. The place to be searched is the entire premises which includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, vehicles which are registered to **MORALES** and/or **HERMANN** and located on the property, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises, including, but not limited to, the Conex-style shipping container described in paragraphs 40 and 46 of the Affidavit of DEA SA James C. George.

C. The location to be searched also includes the following vehicles:

a. a silver Toyota Matrix with CA license plate YASHI46, registered to Royce Lavergne McClellan or Renee Michele **HERMANN** at 1901 Matson Drive, Sacramento, CA 95822;

b. a white Dodge Ram truck with CA license plate 48628Y2, registered to Shawn Eric MORALES Sr. at 997 Hood Franklin Rd, Hood, CA;

c. a white Subaru Forester with CA license plate 9GXQ273, which is registered to Shawn Eric MORALES Sr. at P.O. Box 197, Hood, CA; and

d. a silver BMW X-series with CA license plate 8VQW289 that is registered to MORALES. It is noted that the registration information lists the address of 977 Hood Franklin Rd, which is one digit off from the address of the **TARGET LOCATION.**

D. The location to be search also includes the following individuals, including any and all clothing and personal belongings, including backpacks, wallets, briefcases, and bags that are within their immediate vicinity and control when the search warrant is executed.:

a. The person of Shawn Eric MORALES Sr. (DOB XX/XX/1973). His California Department of Motor Vehicles (DMV) issued driver's license (A8133167) describes him as 5 feet 9 inches, 190 pounds, with black hair and brown eyes, and the photo on his driver's license appears below:



b. The person of Renee Michelle HERMANN (DOB XX/XX/1970). Her California Department of Motor Vehicles (DMV) issued driver's license (A1009704) describes her as 5 feet 9 inches, 150 pounds, with brown hair and brown eyes, and the photo on her driver's license appears below:



## <u>Attachment A-2</u>

**Property to be Searched**

The property to be searched includes the following cell phones:

1. A cell phone utilizing phone number (916) 599-4787 (**TARGET CELL PHONE 1**).
2. A cell phone utilizing phone number (916) 856-4460 (**TARGET CELL PHONE 2**).
3. A cell phone utilizing phone number (916) 370-0953 (**TARGET CELL PHONE 3**).

# Attachment B-1

***Items to be Seized***

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by **CORNEJO-QUEZADA**, **MORALES**, **HERMANN**, and their co-conspirators:

- 21 U.S.C. § 846 – Conspiracy to Distribute Controlled Substances
- 21 U.S.C. § 841(a)(1) – Distribution of Controlled Substances

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Controlled substances, including methamphetamine, or items frequently used to distribute methamphetamine, or items containing residue from the distribution of methamphetamine; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including glass vials (including dropper vials), alcohol and solvents, plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2. United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase methamphetamine from **CORNEJO-QUEZADA**, **MORALES**, and/or **HERMANN** during this investigation;

3. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of Title 21 U.S.C. § 841(a)(1);

5. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6. Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone

numbers, communications, and illegal activities of associates in drug trafficking activities;

7. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person; and

11. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

## Attachment B-2

***Items to be Seized***

1. All records and information on the devices described in Attachment A-2 that relate to violations of 21 U.S.C. §§ 846, 841(a)(1), including:

   a. Any records of incoming, outgoing, and missed calls, including the number(s) associated with the phone, last numbers dialed, last calls received, time of calls, and duration of calls;

   b. Any incoming and outgoing recorded messages and stored voicemail messages;

   c. Emails;

   d. Any record of "contacts" stored in the telephone, including stored names and phone numbers, email addresses, and other identifying contact information;

   e. Any incoming, outgoing, or draft text messages;

   f. Stored media such as photographs, video images, and audio clips;

   g. Stored reminders, memos, notes, documents, and lists;

   h. Data identifying the owner and/or user(s) of the telephone;

   i. Passwords used to access the electronic data described above;

   j. Any records of appointments and/or reminders annotated on a calendar;

   k. Communications via applications installed on the device(s), such as Facebook, Messenger, Telegram, WhatsApp, Signal, Instagram, or other applications;

   l. Location and geolocation information, including addresses, GPS coordinates, names, dates, times, or other electronic data related to driving directions;

   m. Data and information related to stored applications and/or websites used to communicate with associates and co-conspirators;

   n. Data, information, or documents related to the possession and distribution of controlled substances, including the acquisition, possession, and of drugs, paraphernalia, and drug proceeds;

   o. Lists of customers and related identifying information;

p. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

q. Any information related to sources of drugs or drug manufacturing materials and equipment (including names, addresses, phone numbers, email addresses, or any other identifying information);

r. Any information recording schedule or travel;

s. All bank records, checks, credit card bills, account information, and other financial records;

t. Data, information, or documents related to the receipt of proceeds from controlled substances distribution and the transfer, investment, including control, and disposition of those proceeds;

u. Records of Internet Protocol addresses used;

v. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

w. Photographs or communications related to firearm use or possession.

2. Evidence of user attribution showing who used or owned the device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**United States v. Cornejo-Quezada et al**
**Penalties for Criminal Complaint**

**Defendants**
**FRANCISCO CORNEJO-QUEZADA,**
**SHAWN ERIC MORALES SR., AND**
**RENEE MICHELLE HERMANN**

**COUNT 1:** **ALL DEFENDANTS**

VIOLATION: 21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine

PENALTIES: A mandatory minimum term of 10 years and maximum of life in prison; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years up to life

SPECIAL ASSESSMENT: $100 (mandatory)